UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

<table>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>GREGORY JACKSON,</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>Plaintiff,</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>v.</td><td>:</td><td>12 Civ. 1069 (KPF)</td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>MITCHELL BARDEN, M.D., <em>personally</em>,</td><td>:</td><td>REDACTED OPINION</td></tr>
<tr><td>SUKHMINDER SINGH, M.D., <em>personally</em>,</td><td>:</td><td>AND ORDER</td></tr>
<tr><td>RAVINDER SIDHU, M.D., <em>personally</em>,</td><td>:</td><td></td></tr>
<tr><td>MICHAEL SUSCO, M.D., <em>personally</em>, and</td><td>:</td><td></td></tr>
<tr><td>SAINT FRANCIS HOSPITAL,</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>Defendants.</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
</table>

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 8, 2018

KATHERINE POLK FAILLA, District Judge:

Cognizant of the gravity of such an event, New York law establishes detailed procedures for hospitalizing an individual against his or her will. One such procedure, codified in New York Mental Hygiene Law ("MHL") § 9.37, allows a hospital to "receive and care for" any person who, "in the opinion of the director of community services or the director's designee, has a mental illness for which immediate inpatient care and treatment" is appropriate and that is "likely to result in serious harm to" him or herself or others.

On October 22, 2009, Plaintiff Gregory Jackson was involuntarily hospitalized pursuant to MHL § 9.37 after he displayed alarming behavior to, among many others, numerous medical professionals from whom he received treatment. In 2012, Plaintiff brought this action against several physicians involved in his hospitalization and the receiving hospital, seeking damages for

alleged violations of (i) the Fourth and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983, (ii) the Rehabilitation Act, 29 U.S.C. § 794, and (iii) New York's common-law tort of medical malpractice.

After extensive discovery, as well as a lengthy delay occasioned by the bankruptcy filing of the receiving hospital, Defendants have moved for summary judgment on all of Plaintiff's claims. Plaintiff opposes the motions except as they pertain to his Rehabilitation Act claim, which he now abandons. As set forth in the remainder of this Opinion, all but one of the Defendants were not acting on behalf of the State when making decisions about Plaintiff's condition and treatment, and the remaining Defendant is subject to qualified immunity for his conduct. Accordingly, Plaintiff's federal claims fail, and the Court declines to exercise supplemental jurisdiction over Plaintiff's state-law claims.[1]

---

[1]    The Court draws the facts in this Opinion from the parties' submissions in connection with the motions for summary judgment, including the Local Rule 56.1 Statements of Defendants Barden ("Barden 56.1"), and Sidhu, Susco, and Saint Francis Hospital ("Saint Francis 56.1"); Plaintiff's opposition to Defendant Barden's 56.1 statement ("Pl. 56.1 Opp." (Dkt. #145)); Plaintiff's Affidavit ("Pl. Aff." (Dkt. #147)); the deposition transcripts of Plaintiff ("Pl. Dep."), Mitchell Barden ("Barden Dep."), John Stern ("Stern Dep."), Donna Lehnert ("Lehnert Dep."), Ravinder Sidhu ("Sidhu Dep."), Sukhminder Singh ("Singh Dep."), and Michael Susco ("Susco Dep."); the declarations of Ravinder Sidhu ("Sidhu Decl."), Michael Susco ("Susco Decl."), Sukhminder Singh ("Singh Reply Decl."), and Lisa Slocum ("Slocum Decl."); and the exhibits attached to the declarations of Mitchell Barden ("Barden Decl., Ex. [ ]"), Adam Sansolo ("Sansolo Decl., Ex. [ ]"), and Ellen A. Fischer ("Fischer Decl., Ex. [ ]"). For convenience, the Court shall refer to Plaintiff's memorandum of law in opposition to summary judgment as "Pl. Opp." (Dkt. #144). Any document above lacking an accompanying docket number was filed under seal and will be refiled in redacted form pursuant to the Court's instructions.

Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein. Where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding

# BACKGROUND

## A.    Factual Background

The parties quibble over many of the factual details underlying Plaintiff's background and hospitalization.  While none rises to the level of a genuine dispute of material fact, the Court discusses both parties' accounts when and to the extent they diverge.

### 1.    Plaintiff's Background

The most significant source of information concerning Plaintiff comes not from his sworn statements, but from his "Core History," a document assembled by the New York State Office of Mental Health ("OMH") and available to certain healthcare professionals.  As discussed below, this document contains highly relevant information regarding Plaintiff's psychiatric, criminal, and personal histories.

#### a.    Plaintiff's Psychiatric History

Plaintiff, now 55 years old, has an extensive history of psychiatric illness [redacted].  (*See* Pl. 56.1 Opp. ¶¶ 1, 15-16).  [Redacted].  Despite these serious diagnoses, Plaintiff has a history of failing to comply with medical treatment directives, including the taking of medication, leading to numerous inpatient hospitalizations.  (*Id.* at ¶ 2).

---

numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

The Court also pauses to extend its appreciation to Plaintiff's counsel, who provided exceptional representation to Plaintiff despite significant changes to counsel's clinical responsibilities during the pendency of this litigation.  (*See* Dkt. #156).

Although his medical history precludes him from contesting the fact of these psychiatric hospitalizations, Plaintiff vigorously disputes certain ancillary details. For example, Plaintiff's medical records state that in 1987, Plaintiff assaulted a coworker, consequently lost his job, and was hospitalized at Prince George Hospital in Maryland for two weeks. (*See* Pl. 56.1 Opp. ¶ 17). Plaintiff acknowledges that he was involved in a shoving match at work, but insists that he neither lost his job nor was hospitalized after the incident. (*See id.*).

From April to May of 1989, Plaintiff was hospitalized for approximately two weeks at the Hudson River Psychiatric Center ("HRPC") "for [redacted] behavior." (Pl. 56.1 Opp. ¶ 19). In June 1990, Plaintiff was readmitted to HRPC for a similar length of time, in this instance for assaulting his wife and threatening his neighbors. (*See id.* at ¶ 20). Plaintiff admits that he kicked his wife but denies threatening his neighbors, stating that he "never threatened to cause harm," but only played music loudly over his neighbors' objections. (Pl. Aff. ¶ 57; *see id.* at ¶ 55). Plaintiff's records indicate that upon admission, "he was [redacted]," and when asked about his interactions with his wife stated, "I tried to instill a little fear in her, that's all." (Pl. 56.1 Opp. ¶¶ 21-22). In connection with the instant motions, Plaintiff contends that this quote was taken out of context, and that he made this statement in relation to a "feigned suicide attempt" purported to invoke pity in his wife so that she would financially support him. (*Id.* at ¶ 22).

In February 1991, Plaintiff was again admitted at HRPC, this time for approximately three weeks. (*See* Pl. 56.1 Opp. ¶ 23). Plaintiff's medical history

states that this hospitalization resulted after he assaulted his wife, but he denies this incident.  (*Id.*).[2]  Upon admission, Plaintiff was [redacted], but Plaintiff contests that he displayed any behavior warranting such treatment. (*See id.* at ¶ 24).

In 1992, Plaintiff was admitted to HRPC from May 27 to July 22 "because of [redacted] behavior" after an altercation with his wife when she served him with a separation order.  (Pl. 56.1 Opp. ¶ 25).  Plaintiff contends such service never occurred, "and hence, [he] could not have been agitated in response to this action."  (*Id.*).  Nevertheless, Plaintiff does not dispute that during his admission, he was [redacted].  (*See id.* at ¶¶ 26-27).

In May 2006, Plaintiff was hospitalized for one week "due to [redacted]. (Pl. 56.1 Opp. ¶ 28).  Later that same year, from October 19 to December 29, Plaintiff was admitted to Defendant Saint Francis Hospital ("Saint Francis") in Poughkeepsie, New York [redacted].  (*Id.* at ¶ 30).  Plaintiff was thereafter involuntarily transferred to HRPC for a period of time that the record does not specify.  (*See id.* at ¶ 31).

### b.    Plaintiff's Criminal History

Plaintiff's criminal history, as presented in his Core History, consists of six arrests and four convictions, spanning from 1984 to 2009.  (*See* Pl. 56.1

---

[2]    Plaintiff contends the only violent behavior in which he engaged was the 1989 assault on his wife.  (*See* Pl. Aff. ¶ 55).  Though he admits that on another occasion around 1999 or 2000, he "attempted to hit [his] ex-girlfriend," he attempts to minimize this attack, stating "she turned away" and Plaintiff therefore missed and "did not strike her." (*Id.*).

Opp. ¶ 35).[3]

Several of Plaintiff's convictions involve forceful or destructive behavior. On January 19, 2008, Plaintiff was charged with burglary but later pled guilty to a lesser offense of criminal trespass. (Pl. 56.1 Opp. ¶¶ 36-37). On February 23, 2009, Plaintiff was charged with criminal mischief with intent to damage property after vandalizing the exterior of a building. (*See id.* at ¶ 32). The charges were dismissed in March 2009 upon a finding that Plaintiff was incapacitated [redacted]. (*See id.*; *see also* N.Y. Crim. Proc. Law § 730.40 (establishing procedure for finding incapacity to stand trial and remand to care of OMH)). On February 23, 2009, Plaintiff was also charged with criminal mischief and damaging another person's property in excess of $250. (*See* Pl. 56.1 Opp. ¶ 40). These charges were also dismissed in March 2009 after Plaintiff was found incapacitated. (*Id.* at ¶ 41).

Plaintiff's Core History also evinces, with varying degrees of detail, his participation in a number of crimes involving theft or fraud. In November 2000, Plaintiff was charged with criminal possession of stolen property, a charge to which he later pled guilty. (*See* Barden Decl., Ex. N, at 3). On December 10 and 19, 2002, Plaintiff was charged with carrying out a scheme to defraud, though his Core History does not provide the details of the scheme or the ultimate resolution of these charges. (*See id.*). In November 2003, Plaintiff

---

[3]     During his deposition, Plaintiff admitted to additional convictions not contained in his Core History. (*See, e.g.*, Pl. Dep. 261:19-23 (admitting to "[m]ore than five" convictions); *id.* at 264:17-25 (admitting to conviction for assault with a dangerous weapon resulting in four-year prison sentence)).

was charged with criminal impersonation, to which he later pled guilty and for which he was sentenced to three years' probation. (*Id.*). And in April and October 2008, Plaintiff was charged with issuing bad checks; the Core History does not indicate the resolution of these charges. (*Id.* at 4).

### c. Plaintiff's History of Substance Abuse

Plaintiff's Core History recites that in the late 1980s to early '90s, Plaintiff's drug and alcohol abuse, coupled with [redacted], resulted in "numerous admissions to HRPC." (Barden Decl., Ex. N, at 5). Plaintiff has also been [redacted] (Pl. 56.1 Opp. ¶ 33), and his Core History states that he "reports extensive use of crack cocaine and marijuana and has had 2 DWI's in his early 20's as a result of drinking" (Barden Decl., Ex. N, at 6).[4] After Plaintiff's week-long hospitalization in May 2006, he began outpatient treatment but did not consistently comply, leading to a relapse of crack cocaine use in August 2006. (*See* Pl. 56.1 Opp. ¶¶ 29, 34). According to Plaintiff, he last used cocaine in 2008. (*Id.* at ¶ 33).

### d. Plaintiff's [Redacted]

[Redacted].

## 2. Events Preceding Plaintiff's October 2009 Involuntary Hospitalization

The events leading up to Plaintiff's involuntary hospitalization on October 22, 2009, involve numerous interactions with psychiatric support specialists, healthcare providers, and other professionals. Several of these

---

[4] Despite this statement, the criminal history section of Plaintiff's Core History reflects only one conviction for driving while intoxicated. (*See* Barden Decl., Ex. N, at 3-4).

individuals were affiliated with New York State and local governments. Of note, however, the hospital to which Plaintiff was admitted was private, as were its employees.

### a. Dutchess County's Involuntary Hospitalization Procedure

Defendant Mitchell Barden, M.D., was the initial medical professional who completed an MHL § 9.37 application to have Plaintiff evaluated for hospitalization. (*See* Barden 56.1 ¶¶ 102-03). In October 2009, Dr. Barden was an OMH psychiatrist employed at HRPC. (*See id.* at ¶ 3). In this capacity, Dr. Barden was the leader and decision-maker for the Dutchess County Mobile Crisis Team ("MCT"), a state-operated entity of healthcare professionals dispatched to sites within the County to address psychiatric crises. (*See id.* at ¶¶ 3-6).

More specifically, after receiving a dispatch referral, Dr. Barden was responsible for determining whether an individual satisfied MHL § 9.37 by presenting sufficient danger to require hospitalization and further psychiatric evaluation. (*See* Barden Dep. 17:17-23). Upon such determination, police or other authorities would apprehend the individual and transport him or her to a hospital for psychiatric evaluation in accordance with MHL § 9.37. (*See id.* at 20:23-21:11).[5]

---

[5]     The Court discusses the further operation of MHL § 9.37 below.

### b.    The Dutchess County Psychiatric Helpline

The MCT dispatches its healthcare professionals based on referrals from a 24-hour Helpline operated by the Dutchess County Department of Mental Hygiene.  (*See* Barden Dep. 20:15-21:11).  The Helpline also provides counseling and a contact point for psychiatric emergency services.  (Stern Dep. 8:12-21).  At the time of Plaintiff's hospitalization, Helpline Clinical Unit Administrator John Stern was responsible for referring individuals for involuntary hospitalization evaluations.  (*Id.* at 7:18-8:21).

Stern described Plaintiff as "a frequent caller to Helpline" (Stern Dep. 19:18), and Plaintiff does not dispute that he called "[m]any times" (Pl. Dep. 96:8).  Indeed, Stern testified that Plaintiff called so often that it "significantly interfered with [Helpline's] operation."  (Stern Dep. 20:12-14).  According to Stern, Plaintiff would often express hostility toward Helpline staff, such as threatening lawsuits, causing Stern to be "frightened for [his] safety, and ... for the safety of the staff."  (*Id.* at 66:23-67:5).

### c.    Assertive Community Treatment

Assertive Community Treatment ("ACT") is an intensive, outpatient psychiatric program that treats patients who require frequent hospitalization and home visits.  (*See* Barden Dep. 25:14-21; Stern Dep. 58:24-25).  In June 2009, ACT admitted and began providing outpatient services to Plaintiff.  (*See* Pl. Dep. 248:10-249:12).  On October 14, 2009, however, Dr. Stacyann Hahn, Director of ACT, completed a memo stating that Plaintiff "would be discharged from the ACT team immediately" because he was not cooperating with

treatment and was becoming [redacted]. (Barden Decl., Ex. O; *see* Barden Dep. 27:6-7, 28:13-14). This memo was then forwarded to Dr. Barden. (*See* Barden Dep. 27:4-22). Somewhat presciently, Dr. Barden received word from ACT during this time that he might one day need to dispatch the MCT to pick up Plaintiff because Plaintiff was [redacted]. (*See id.* at 26:19-27:3, 29:22-30:5).

### d. Plaintiff's Visit to the Dutchess County Executive's Office

One week after his discharge from the ACT program, on October 22, 2009, Plaintiff visited the Dutchess County Executive's Office. Plaintiff concedes that during that entire month, he was suffering from [redacted]. (Pl. 56.1 Opp. ¶¶ 48-49). He further acknowledges that he did not sleep at all the preceding evening. (*Id.* at ¶ 47).

Accounts diverge as to the tenor and extent of Plaintiff's interactions with employees at the office. The first person Plaintiff encountered was Donna Lehnert, a budget assistant in the Dutchess County Budget Office, which shared office space with the Dutchess County Executive. (*See* Lehnert Dep. 6:23-7:13). Among other duties, Lehnert was responsible for greeting visitors of both offices, and her desk sat alone in a front entrance room. (*See id.* at 7:5-8, 8:1-7).

According to Lehnert, she received a phone call from Plaintiff on the morning of October 22 in which he requested to meet with the County Executive; when Lehnert informed Plaintiff that the County Executive was unavailable and asked if she could take a message, Plaintiff stated "he had something to show [the County Executive] … regarding Mental Hygiene."

(Lehnert Dep. 14:8-14).  Within an hour of the call, Plaintiff arrived at the office and requested to schedule a meeting with the County Executive.  (*Id.* at 14:15-18, 15:12-13).  When Lehnert stated that the County Executive was unavailable, Plaintiff "got agitated and … started walking and pacing and talking to himself" before having a seat and repeatedly opening, looking into, and closing a briefcase.  (*Id.* at 15:14-22).  Lehnert tried to obtain information from Plaintiff to schedule an appointment, but Plaintiff "got upset[,] … started pacing[,] and [said] he wanted to wait for" the County Executive.  (*Id.* at 17:25-18:6).

Plaintiff's behavior frightened Lehnert:  "His behavior was threatening. … He was talking to himself, he was pacing and he kept looking in a dark briefcase.  It was scary.  It's threatening." (Lehnert Dep. 21:21, 21:24-22:1).  While Plaintiff was still in the office, Lehnert emailed a coworker to request security personnel.  (*Id.* at 18:8-11).  In the meantime, Plaintiff began reading pamphlets available in the office, continued opening and closing his briefcase, and began "mumbling to himself."  (*Id.* at 18:17-24).  After Lehnert sent a second email to her coworker, the coworker came to Lehnert's office, questioned Plaintiff, and left.  (*See id.* at 19:4-18).

By the time security arrived, Plaintiff had exited.  (*See* Lehnert Dep. 20:8-12).  With Plaintiff gone, Lehnert called the Deputy Sheriff on duty in the building to inform him that she neither wanted Plaintiff to return to the office nor wanted to be alone.  (*Id.* at 23:22-24:7).  Lehnert then called the

Helpline to inform John Stern that Plaintiff had visited the office; Lehnert also asked Stern whether Plaintiff was violent. (*See id.* at 25:17-26:2).[6]

At approximately 9:45 a.m., Stern called Dr. Barden and warned him that the MCT might need to evaluate Plaintiff for hospitalization. (*See* Barden Dep. 31:8-17). During the call, Stern indicated that Plaintiff

> was harassing [someone] at the County Executive's office, that he had been there earlier that day and had to be escorted out, that in the past he had often frequented that office and had to be escorted out by security, that he was refusing medication and treatment, that he was hostile towards Mr. Stern and [Helpline] staff, [redacted], and ... that [he] was making threats towards the Helpline staff.

(*Id.* at 31:21-32:8). Stern also informed Dr. Barden that in the past, when Plaintiff "refused medication[, he] had a history of becoming [redacted], and that at [that] time [Plaintiff] was refusing all treatment and medication." (*Id.* at 32:16-20).

Later that day, Stern completed a Mobile Team Referral form, requesting the MCT to evaluate Plaintiff. (*See* Stern Dep. 39:21-40:3; Barden Decl., Ex. P). The reason for referral, as Stern handwrote in the form, was that [redacted]. (Stern Dep. 40:17-20; *see* Barden Decl., Ex. P). The form instructed the MCT to "[e]valuate [Plaintiff] for hospitalization." (Stern Dep. 40:20-21; *see* Barden Decl., Ex. P).

Plaintiff tells a different story. According to him, on the morning of October 22, he never called the County Executive's Office, but merely visited to

---

[6]     During her deposition, Lehnert could not recall whether Stern answered this question. (*See* Lehnert Dep. 26:11).

make an appointment with and obtain the name and phone number of someone who could help him obtain records from HRPC to support an ongoing lawsuit against the psychiatric center. (*See* Pl. Aff. ¶¶ 23-24; Pl. Dep. 66:14-67:2). While he was at the office, the County Executive entered Lehnert's office and asked Plaintiff to present a letter from HRPC denying him access to the records he sought. (Pl. Aff. ¶ 26). Plaintiff responded that he only wanted the name and number of someone who could help him, and he promptly left after receiving that information and sitting in the office to rest for a short time. (*See id.* at ¶¶ 26-29). In further contrast to Lehnert's testimony and Stern's report, Plaintiff states that he only opened his briefcase once to store a brochure from the office, and he denies pacing or threatening anyone while he was there. (*Id.* at ¶¶ 28-29).

### e. Plaintiff's Interaction with Dr. Barden

After receiving the referral from Stern, Dr. Barden reviewed Plaintiff's Core History and, based on this review along with the information received from Stern and ACT members, determined that Plaintiff was at "a very high risk of being [redacted] towards others." (Barden Dep. 38:3-14; *see id.* at 26:19-27:14). Before Dr. Barden or the MCT could examine Plaintiff per the referral form, however, Plaintiff unexpectedly appeared at Dr. Barden's office at around 11:00 a.m. (*See* Pl. 56.1 Opp. ¶ 89). Plaintiff has explained that he went to Dr. Barden's office at the direction of the Director of Community Services, who informed Plaintiff that Dr. Barden was a psychiatrist who could administer prescription antipsychotic medication. (Pl. Aff. ¶ 31).

Here again, the parties provide differing accounts of events. According to Plaintiff, his interaction with Dr. Barden lasted less than a minute. (*See, e.g.*, Pl. Aff. ¶ 33; Pl. Dep. 70:14-16 ("I saw him for about 24 seconds and I left[.]")). Plaintiff explained that he eschewed Dr. Barden's professional services because the doctor looked unprofessional. (Pl. Aff. ¶ 32). Plaintiff further describes their encounter as follows:

> I walked in and asked "are you Dr. Barden?" Dr. Barden replied "yes." I then stated "I will let you know if I want to be treated by you." Dr. Barden said "wait." I replied "I'm leaving." Dr. Barden again said "wait." I then said "I've spoken" and left his office.

(Pl. Aff. ¶ 33).

Under Dr. Barden's account, the two met for approximately ten minutes. (Barden Dep. 44:2-5). After he met Plaintiff in the waiting room and took him to a conference room for an evaluation, Plaintiff began commenting about Dr. Barden's eyes, saying they "looked evil" and "infectious," and "that the devil was present in [Dr. Barden's] eyes." (*Id.* at 39:15-40:5). Dr. Barden responded that he was blind in one eye and had a cadaveric corneal graft that was not infectious. (*Id.* at 40:5-8). Plaintiff denies mentioning Dr. Barden's eyes during their meeting. (*See* Pl. Aff. ¶ 34).[7]

Dr. Barden recalls Plaintiff stating that he was facing harassment from government agencies and healthcare providers, such as HRPC, ACT, Saint Francis, and Helpline, along with individuals associated with those entities,

---

[7] Plaintiff claims Dr. Barden concocted this exchange after reading a prior complaint that Plaintiff filed in state court in which he described Dr. Barden's eyes as "devilish." (Pl. Aff. ¶ 34).

including John Stern and Stacyann Hahn. (*See* Barden Dep. 40:20-41:6). This alleged harassment consisted of statements to Plaintiff that [redacted], and Plaintiff feared that this might lead to further hospitalization. (*See id.* at 41:11-19). Dr. Barden then asked Plaintiff about his threats to the Helpline staff and whether [redacted], to which Plaintiff impliedly responded that [redacted]. (*See id.* at 41:21-42:2). Dr. Barden was unable to evaluate Plaintiff further because Plaintiff abruptly departed. (*Id.* at 42:9-12).

### f. Dr. Barden's Application for Involuntary Hospitalization

After his interaction with Plaintiff, Dr. Barden concluded that Plaintiff was "extremely dangerous to others"; indeed, Dr. Barden feared for his own safety, especially given Plaintiff's vociferous opposition to even the possibility of hospitalization. (Barden Dep. 43:8-24). Dr. Barden estimates that his entire time spent determining whether Plaintiff required hospitalization — consisting of reading Plaintiff's medical history, speaking with Stern, and preparing the case for other MCT members — spanned approximately 45 minutes. (*Id.* at 44:9-47:20). Based on these sources as well as his interaction with Plaintiff, Dr. Barden completed an MHL § 9.37 Application for Involuntary Admission to Saint Francis, finding that Plaintiff presented "a substantial risk of physical harm to other persons, as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm." (Barden Decl., Ex. Q; *see* Barden Dep. 58:11-20).[8]

---

[8] Certain of the moving parties make arguments concerning Plaintiff's potential danger to himself on that day (*see, e.g.*, Singh Br. 7-8), but the Court focuses in this Opinion on the basis cited by Dr. Barden in the Application for Involuntary Admission.

In the application, Dr. Barden described Plaintiff's behavior as follows: "Patient is [redacted]. Patient has been harassing the County Executive and the head of HRPC and others. His [insight and] judgments are poor." (Barden Dep. 58:25-59:5; *see* Barden Decl., Ex. Q). During his deposition, Dr. Barden added additional reasons for completing the application: Plaintiff "made threats to harm staff at County Helpline[,] … denies having mental illness[,] and has in the past become violent when not taking medication." (Barden Dep. 59:6-20). Furthermore, Dr. Barden testified that Plaintiff's Core History revealed a pattern of behavior that posed a danger to Plaintiff's self and others, including [redacted]. (*See, e.g.*, *id.* at 68:2-69:9).

### 3. Plaintiff's Hospitalization at Saint Francis

After Dr. Barden submitted his application, authorities apprehended Plaintiff at his apartment and transported him to Saint Francis, a private Catholic community hospital. (*See* Pl. 56.1 Opp. ¶ 107; Pl. Dep. 132:24-133:3; Sidhu Decl. ¶ 4). Again, the parties provide divergent tales of what occurred following Plaintiff's arrival at Saint Francis.

### a. Dr. Sidhu's Initial Evaluation

On October 22, 2009, Defendant Ravinder Sidhu, M.D., was on duty at Saint Francis as an emergency medicine physician; Dr. Sidhu was not a municipal employee and did not hold public office. (Sidhu Decl. ¶ 4). In the context of receiving a patient for psychiatric admission, Dr. Sidhu was responsible for evaluating the patient to determine whether the reason for the

behavior underlying the patient's admission was psychiatric as opposed to medical. (*See* Sidhu Dep. 87:11-88:11).

After Plaintiff arrived at Saint Francis, at 1:00 p.m., a registered nurse began triaging Plaintiff but was unable to complete her evaluation because Plaintiff was [redacted]. (Sidhu Decl. ¶ 6; *see* Fischer Decl., Ex. N, at 18-19). Approximately ten minutes later, the nurse summoned Dr. Sidhu for assistance. (*See* Sidhu Decl. ¶ 7; Sidhu Dep. 34:18-22). Dr. Sidhu then evaluated Plaintiff and found him to be [redacted] such that he was "physically intimidating and threatening." (Sidhu Decl. ¶ 8). Dr. Sidhu therefore spent 20 minutes attempting to calm Plaintiff through verbal de-escalation, offering oral medication, and a time-out period, all of which Plaintiff refused. (*See* Fischer Decl., Ex. N, at 34; Sidhu Dep. 51:5-13).

After exhausting these less intrusive techniques, Dr. Sidhu directed the staff to [redacted] in order to calm Plaintiff and prevent him from injuring himself or others. (*See* Sidhu Decl. ¶ 14; Sidhu Dep. 57:2-58:23). Despite Dr. Sidhu's efforts to pacify Plaintiff, he remained "combative and restless" for approximately one hour after their administration. (Sidhu Decl. ¶ 15; *see* Fischer Decl., Ex. N, at 46). Once these behaviors subsided, Dr. Sidhu [redacted]. (*See* Sidhu Decl. ¶ 16; Fischer Decl., Ex. N, at 34). Dr. Sidhu later testified that his decision to order Plaintiff's restraint and medication was "based only on his condition and conduct in the Emergency Department at [Saint Francis]." (Sidhu Decl. ¶ 17). And although Dr. Sidhu was aware of Dr. Barden's determination that Plaintiff was mentally ill and dangerous, Dr. Sidhu

"did not rely solely upon [that] information" in arriving at his decision.  (*Id.* at ¶ 18).  Ultimately, Dr. Sidhu cleared Plaintiff to receive psychiatric treatment at Saint Francis.  (*See* Sidhu Dep. 88:14-17).

Plaintiff's version of events casts Dr. Sidhu as much less methodical.  According to Plaintiff, he initially met with a nurse at Saint Francis who summoned Dr. Sidhu; the nurse then returned with a needle in hand along with the doctor and two security guards.  (*See* Pl. Aff. ¶ 38).  As opposed to Dr. Sidhu's claimed efforts to calm Plaintiff, Plaintiff contends his sole interaction with Dr. Sidhu was the latter saying something Plaintiff found confusing, to which Plaintiff responded, "you don't have to thought police me."  (*Id.*).  Dr. Sidhu then "stuck his thumb up in the air and said to the nurse and security staff that they could give [Plaintiff] the injection."  (*Id.*).  The nurse and security guards then restrained and medicated Plaintiff.  (*See id.* at ¶ 40).[9]

### b.    Dr. Singh's Psychiatric Evaluation

Plaintiff's next relevant encounter with Saint Francis personnel was with Defendant Sukhminder Singh, M.D., who worked as a staff psychiatrist.  (*See* Singh Dep. 10:5-8).  At 4:19 p.m., Dr. Singh performed a psychiatric evaluation of Plaintiff to evaluate the need for Plaintiff's immediate hospitalization.  (*See id.* at 49:25-50:9; Fischer Decl., Ex. N, at 11-12).  Dr. Singh's evaluation notes

---

[9]    Plaintiff's testimony is unclear as to whether he was restrained before or after receiving medication: during his deposition, Plaintiff testified that the nurse medicated him *after* he was restrained, but his affidavit states that he was medicated *before* he was restrained.  (*Compare* Pl. Dep. 165:1-9, *with* Pl. Aff. ¶¶ 38, 40, 42).  *See generally Mack* v. *United States*, 814 F.2d 120, 124-25 (2d Cir. 1987) ("It is well settled in [the Second] [C]ircuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.").

reflect his assessments of Plaintiff's immediate, personal, and past medical histories, including [redacted]. (Fischer Decl., Ex. N, at 11). Dr. Singh also reported that Plaintiff was [redacted]. (*Id.*). Concluding his evaluation, Dr. Singh diagnosed Plaintiff with [redacted] and ordered his involuntary admission to the care of Defendant Michael Susco, M.D., thereby confirming Dr. Barden's initial MHL § 9.37 determination. (*Id.* at 11-12; *see* Saint Francis 56.1 ¶ 238). Dr. Singh estimated that his meeting with Plaintiff lasted approximately 45 minutes. (*See* Singh Dep. 68:18-21).

In stark contrast, Plaintiff claims he never met with Dr. Singh on October 22, 2009. (*See* Pl. Dep. 200:25-201:4). Instead, Plaintiff asserts he only saw Dr. Singh from afar in another office at Saint Francis, and that Plaintiff recognized Dr. Singh from previous interactions at HRPC, where Plaintiff had been a patient and Dr. Singh had been an employee. (*See id.* at 200:1-201:8; Pl. Aff. ¶ 45; Singh Dep. 7:13-25).

### c. Dr. Susco's Psychological Evaluation

In 2009, Defendant Michael Susco, M.D., worked at Saint Francis as the Director of Behavioral Health Services and an attending psychiatric physician. (*See* Susco Dep. 5:19-23). On October 22, 2009, Dr. Susco became Plaintiff's treating physician in order to determine, within 72 hours of admission, whether Saint Francis should continue to retain Plaintiff. (Susco Decl. ¶ 4). On that same date, Dr. Susco learned of the events culminating in Dr. Barden's MHL § 9.37 application. (*See* Susco Decl. ¶ 7). Dr. Susco was also familiar

with Plaintiff — and, by extension, with Plaintiff's pattern of [redacted]. (*Id.* at ¶ 6).

During the two days following Plaintiff's admission at Saint Francis, Dr. Susco observed and interacted with Plaintiff. (Susco Decl. ¶¶ 28-29). Dr. Susco noted that during this time, Plaintiff was "[redacted], pacing, dismissive of attempts to ask him questions, [redacted], [and] refusing vital signs by the technicians," and, further, that Plaintiff "isolated himself from the other patients in a manner as if he thought he was superior to them." (*Id.* at ¶ 29). Dr. Susco later learned that Plaintiff required [redacted] upon his admission to Saint Francis. (*See id.* at ¶ 8).

The day following Plaintiff's admission to Saint Francis, a social worker completed a psychological assessment of Plaintiff. (*See* Fischer Decl., Ex. N, at 30-31). The assessment notes that Plaintiff [redacted]. (Saint Francis 56.1 ¶ 246). On that same date, a nurse noted that Plaintiff "frequently required redirection away from the nurse's station[] due to [redacted] ... [and] was [redacted]," and refused [redacted]. (*Id.* at ¶ 249). An occupational therapist also noted that Plaintiff [redacted]. (*Id.* at ¶ 250). That evening, Plaintiff "remained [redacted]," while he continued to "den[y] psychiatric problems." (*Id.* at ¶ 251).

On October 24, 2009, Plaintiff continued to [redacted]. (St. Francis 56.1 ¶ 252). Plaintiff's notation charts indicate that he [redacted] from October 22 through October 26. (*See* Fischer Decl., Ex. N, at 108). In addition, Plaintiff

refused to allow Saint Francis staff members to assess his vital signs from October 23 until the evening of October 26. (*Id.* at 87-89).

Also on October 24, Dr. Susco met with Plaintiff to determine whether he required further hospitalization and reviewed Plaintiff's admission records in preparation for that meeting. (*See* Susco Decl. ¶¶ 31, 32). During his evaluation, Dr. Susco noted Plaintiff's [redacted]. (*Id.* at ¶ 33). Dr. Susco also observed that Plaintiff [redacted]. (*Id.*). Based on this interaction, a review of Plaintiff's medical history, observations of Plaintiff, and his professional psychiatric judgment, Dr. Susco found that Plaintiff [redacted] "posed a substantial threat of harm to self or others" and required further involuntary hospitalization. (*Id.* at ¶ 32; *see id.* at ¶ 36).

Given his assessment, Dr. Susco completed a form pursuant to MHL § 9.37, certifying his decision that Plaintiff required further hospitalization. (*See* Saint Francis 56.1 ¶ 265). The certification form noted that pertinent factors underlying Dr. Susco's decision consisted of "[redacted]." (*Id.* at ¶ 266). Dr. Susco also diagnosed Plaintiff [redacted] and noted Plaintiff's tendency to harm others. (*See id.* at ¶ 269).

Plaintiff characterizes his interaction with Dr. Susco in much different terms. Although Plaintiff admits to meeting with Dr. Susco on October 24, he asserts that during their meeting, "Dr. Susco did not conduct a psychiatric evaluation of me in which he asked me how I was feeling, what my medications were[,] and what brought me to the hospital." (Pl. Aff. ¶ 48). Instead, the

meeting lasted "no more than five minutes," during which Plaintiff "simply asked for [his] immediate discharge and Dr. Susco said no." (*Id.*)

In any event, on November 5, 2009, Dr. Susco determined that Plaintiff's condition improved enough to warrant his discharge and referral to outpatient treatment. (*See* Susco Decl. ¶ 38; Pl. Aff. ¶ 51). According to Dr. Susco, by that date, Plaintiff was more compliant with treatment, less symptomatic, showed stable vital signs, and took better care of himself. (*See* Susco Decl. ¶ 38).

## B. Procedural Background

Plaintiff filed the initial complaint in this action on February 10, 2012. (Dkt. #2). It named as defendants Drs. Barden, Singh, Susco, and Sidhu, as well as Saint Francis and a John Doe Defendant, and it contained claims under federal law for (i) violations of the Fourth and Fourteenth Amendments against Defendants Barden, Susco, Sidhu, and Doe; and (ii) a violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, against Defendant Saint Francis. (*Id.* at 14-17). It also contained pendent claims under state law for medical malpractice against all Defendants but Dr. Susco. (*Id.* at 17).

On October 19, 2012, Plaintiff amended his complaint to remove John Doe as a Defendant and to add claims against Dr. Singh for (i) violations of the Fourth and Fourteenth Amendments, and (ii) medical malpractice. (Dkt. #28, at 14-18).

On November 2, 2016, the parties stipulated to a dismissal of the medical malpractice claim against Dr. Singh. (Dkt. #118). On November 17,

2016, Defendants Saint Francis, Dr. Sidhu, and Dr. Susco jointly moved for summary judgment on Plaintiff's remaining claims. (Dkt. #122). Also on November 17, Dr. Barden and Dr. Singh filed separate motions for summary judgment. (Dkt. #125, 128). On January 11, 2017, Plaintiff opposed Defendants' motions for summary judgment. (Dkt. #142-47). In Plaintiff's opposition papers, he conceded that Second Circuit precedent, published after he filed the Amended Complaint, forecloses his Rehabilitation Act claim. (*See* Dkt. #144, at 1 (citing *McGugan* v. *Aldana-Bernier*, 752 F.3d 224, 231-34 (2d Cir. 2014)).[10] Defendants thereafter replied to Plaintiff's opposition papers, and summary judgment briefing closed on March 17, 2017, when the Court denied Plaintiff's request to file a sur-reply. (Dkt. #163).

On September 22, 2017, the Court filed an unredacted copy of this Opinion under seal. On that same day, the Court provided the parties with a copy of the unredacted Opinion and allowed the parties to propose redactions. Pursuant to the Court's directions, the parties will file their materials publicly by October 23, 2017, with certain limited categories of information redacted in accordance with *Lugosch* v. *Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006). The Court will then file the redacted Opinion publicly. The Court now considers the pending motions for summary judgment.

---

[10] Given Plaintiff's concession on this claim, Plaintiff's Sixth Cause of Action is hereby dismissed with prejudice.

# DISCUSSION

## A.    Summary Judgment Under Fed. R. Civ. P. 56

Rule 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).[11]  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks and citation omitted).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

While the moving party "bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,'" *ICC Chem. Corp.* v. *Nordic Tankers Trading a/s*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Catrett*, 477 U.S. at 323), the party opposing summary judgment "must do more than

---

[11]    The Court is aware that the 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination.").  As of this past year, the Second Circuit continues to use both formulations. *Compare, e.g.*, *Smith* v. *Barnesandnoble.com, LLC*, 839 F.3d 163, 166 (2d Cir. 2016) ("The moving party bears the burden to demonstrate the absence of any genuine issues of material fact[.]"), *with, e.g.*, *Harris* v. *Miller*, 818 F.3d 49, 53 (2d Cir. 2016) (per curiam) ("[W]e conclude that there are genuine disputes of material fact[.]").  Indeed, the Circuit sometimes uses the terms interchangeably within the same decision. *Compare, e.g.*, *Cross Commerce Media, Inc.* v. *Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016) ("[T]here is a genuine dispute of material fact[.]"), *with, e.g.*, *id.* at 168 ("We therefore think that [the nonmovant] has raised a genuine issue of material fact[.]").  The Court at times relies on the traditional phrasing in this Opinion.

simply show that there is some metaphysical doubt as to the material facts,"
*Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Brown* v. *Henderson*, 257 F.3d 246, 252 (2d Cir. 2001). Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Parks Real Estate Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). In considering "what may reasonably be inferred" from witness testimony, however, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (quoting *County of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)). Moreover, "[t]hough [the Court] must accept as true the allegations of the party defending against the summary judgment motion, ... conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak* v. *City of N.Y.*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citation omitted) (citing *Matsushita,* 475 U.S. at 587; *Wyler* v. *United States,* 725 F.2d 156, 160 (2d Cir. 1983)); *accord Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

**B.    Analysis**

**1.    Plaintiff's Constitutional Claims Fail**

Plaintiff sources his constitutional claims to the Fourth Amendment's prohibition on unreasonable seizures and the Fourteenth Amendment's right to due process.[12]  By virtue of his involuntary hospitalization, Plaintiff was, no doubt, "seized" within the meaning of the Fourth Amendment, *see Glass* v. *Mayas*, 984 F.2d 55, 58 (2d Cir. 1993), and he had a right to be free from unwelcome medical treatment, *see Green* v. *City of N.Y.*, 465 F.3d 65, 84-85 (2d Cir. 2006) (quoting *Cruzan* v. *Dir., Mo. Dep't of Health*, 497 U.S. 261, 278-79 (1990)).  Nevertheless, as the Court explains below, Drs. Singh, Susco, and Sidhu, and Saint Francis (collectively, the "Saint Francis Defendants") cannot be considered state actors, while Dr. Barden, a conceded state actor, is entitled to qualified immunity from Plaintiff's constitutional claims.

**a.    The New York Mental Hygiene Law**

At issue is Section 9.37 of New York's Mental Hygiene Law, which provides in relevant part:

> (a)  The director of a hospital, upon application by a
> director of community services or an examining

---

[12]    Specifically, Plaintiff's First Cause of Action alleges that Dr. Barden violated the Fourth and Fourteenth Amendments by applying for Plaintiff's hospitalization without a finding of dangerousness; the Second Cause of Action alleges that Dr. Singh and Dr. Susco violated the Fourteenth Amendment by authorizing Plaintiff's hospitalization without a finding of dangerousness; the Third Cause of Action alleges that Dr. Singh violated the Fourteenth Amendment by failing to conduct a psychiatric evaluation of Plaintiff; the Fourth Cause of Action alleges that Dr. Susco violated the Fourteenth Amendment by conducting a psychiatric evaluation of Plaintiff that would not accurately estimate the degree of risk Plaintiff presented; the Fifth Cause of Action alleges that Dr. Barden violated the Fourteenth Amendment by applying for Plaintiff's hospitalization without finding that Plaintiff engaged in homicidal or other violent behavior; and the Seventh Cause of Action alleges that Dr. Sidhu violated the Fourteenth Amendment by authorizing the restraint and medication of Plaintiff when he was not creating an emergency at Saint Francis.

physician duly designated by him or her, may receive and care for in such hospital as a patient any person who, in the opinion of the director of community services or the director's designee, has a mental illness for which immediate inpatient care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others.

The need for immediate hospitalization shall be confirmed by a staff physician of the hospital prior to admission. Within seventy-two hours, excluding Sunday and holidays, after such admission, if such patient is to be retained for care and treatment beyond such time and he or she does not agree to remain in such hospital as a voluntary patient, the certificate of another examining physician who is a member of the psychiatric staff of the hospital that the patient is in need of involuntary care and treatment shall be filed with the hospital. From the time of his or her admission under this section the retention of such patient for care and treatment shall be subject to the provisions for notice, hearing, review, and judicial approval of continued retention or transfer and continued retention provided by this article for the admission and retention of involuntary patients, provided that, for the purposes of such provisions, the date of admission of the patient shall be deemed to be the date when the patient was first received in the hospital under this section.

(b) The application for admission of a patient pursuant to this section shall be based upon a personal examination by a director of community services or his designee. It shall be in writing and shall be filed with the director of such hospital at the time of the patient's reception, together with a statement in a form prescribed by the commissioner giving such information as he may deem appropriate.

\*\*\*

(d) After signing the application, the director of community services or the director's designee shall be authorized and empowered to take into custody, detain, transport, and provide temporary care for any such person. Upon the written request of such director or

the director's designee it shall be the duty of peace officers, when acting pursuant to their special duties, or police officers who are members of the state police or of an authorized police department or force or of a sheriff's department to take into custody and transport any such person as requested and directed by such director or designee. Upon the written request of such director or designee, an ambulance service, as defined in subdivision two of section three thousand one of the public health law, is authorized to transport any such person.

MHL § 9.37. In this setting, "likely to result in serious harm"

means (a) a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

*Id.* § 9.01.[13]

### b. The Elements of a Section 1983 Claim

Section 1983 provides a remedy when a state actor deprives a plaintiff of federally protected rights, including rights provided by the Fourth and Fourteenth Amendments. *See* 42 U.S.C. § 1983; *see also City of Okla. City* v. *Tuttle*, 471 U.S. 808, 816 (1985) ("By its terms, of course, [§ 1983] creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere."). "The purpose of § 1983 is to deter state actors from

---

[13]     Plaintiff focuses on an amendment to MHL § 9.37 that defines "likelihood of serious harm" to include "a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear *or* serious physical harm." MHL § 9.37(a)(2) (emphasis added). Among other things, Plaintiff contends that the italicized word should in fact be "of." (*See, e.g.*, Pl. Opp. 1 n.1). However, the statute makes clear that this amendment is not effective until July 1, 2020, and the Court will therefore rely on the definition contained in MHL § 9.01.

using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt* v. *Cole*, 504 U.S. 158, 161 (1992).

"A § 1983 claim has two essential elements: [i] the defendant acted under color of state law; and [ii] as a result of the defendant's actions, the plaintiff suffered a denial of h[is] federal statutory rights, or h[is] constitutional rights or privileges." *Annis* v. *Cty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998); *see also West* v. *Atkins*, 487 U.S. 42, 48 (1988); *Flagg Bros., Inc.* v. *Brooks*, 436 U.S. 149, 155-56 (1978)). Even where these two elements are satisfied, "[t]he doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix* v. *Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Pearson* v. *Callahan*, 555 U.S. 223, 231 (2009)).

### c. The Saint Francis Defendants Were Not State Actors

#### i. Applicable Law

Because constitutional protections constrain only government actors, a plaintiff pursuing a § 1983 claim must show in the first instance that the alleged constitutional violation constitutes state action. *See Fabrikant* v. *French*, 691 F.3d 193, 206 (2d Cir. 2012) (quoting *Flagg* v. *Yonkers Sav. & Loan Ass'n,* 396 F.3d 178, 186 (2d Cir. 2005); *Tancredi* v. *Metro. Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003)). That said, private parties may engage in state action if their behavior is "fairly treated as that of the State itself." *Brentwood*

*Acad.* v. *Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (quoting *Jackson* v. *Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).  Such private conduct becomes state action if (i) "the State compelled the conduct [the 'compulsion test']," (ii) "there is a sufficiently close nexus between the State and the private conduct [the 'close nexus test' or 'joint action test']," or (iii) "the private conduct consisted of activity that has traditionally been the exclusive prerogative of the State [the 'public function test']."  *McGugan* v. *Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014) (alterations in original) (quoting *Hogan* v. *A.O. Fox Mem'l Hosp.*, 346 F. App'x 627, 629 (2d Cir. 2009) (summary order)).

        While considering the issue of state action in the context of involuntary hospitalization, this Court does not write on a blank slate.  In *Doe* v. *Rosenberg*, the Second Circuit upheld the reasoning behind a district court's summary judgment award against a § 1983 plaintiff who alleged constitutional violations at the hands of her private physician and a private hospital and several of its employees.  *See* 166 F.3d 507 (2d Cir. 1999) (per curiam).  The district court had concluded that the plaintiff failed to establish state action under any of the three tests outlined above.  *First*, the plaintiff failed to satisfy the compulsion test because the statute under which she was hospitalized, MHL § 9.27, "by its terms is permissive, not mandatory," given its provision that a "director of a hospital *may*" hospitalize a patient under certain conditions, thus providing discretion to an evaluating physician.  *Doe* v. *Rosenberg*, 996 F. Supp. 343, 349-50 (S.D.N.Y. 1998) (quoting MHL § 9.27), *aff'd*, 166 F.3d 507.  *Second*, the private hospital's contract with OMH allowing

it to operate a psychiatric practice, and its OMH license to serve as a primary psychiatric emergency care provider, were insufficient to satisfy the close-nexus test because "the mere fact that a business is subject to state regulation does not by itself convert its action into that of the State ... [n]or does the fact that the regulation is extensive and detailed[.]" *Id.* at 352 (quoting *Jackson*, 419 U.S. at 350). *Third* and finally, the hospitalization authority that the MHL bestows on hospitals and physicians is not the sort of power traditionally reserved for the State because "[t]he responsibility for invalid commitment lies with the physician as a private individual," and thus fails to satisfy the public-function test. *Id.* at 353.

More recently, in *McGugan* v. *Aldana-Bernier*, the Second Circuit affirmed the dismissal of a § 1983 claim alleging constitutional violations in the form of forced medication and hospitalization both while and after police transported the plaintiff to a private hospital that received federal funds and was licensed by OMH to provide psychiatric treatment. 752 F.3d at 227-28. After the plaintiff was hospitalized, two doctors had separately certified her as suffering from a mental illness likely to result in substantial harm to herself or others and determined to hospitalize her further pursuant to MHL § 9.39, which pertains to emergency admission of patients for immediate observation, care, and treatment. *Id.* at 228. Finding no meaningful differentiation from *Rosenberg*, the Court ruled that these doctors were not state actors, because although "the state endowed [the doctors] with the authority to involuntarily

hospitalize (and medicate) the plaintiff, … it did not compel them to do so." *Id.* at 229.

So too here. While Plaintiff portrays the physicians at Saint Francis as summarily confirming Dr. Barden's initial application, his unsupported assertions are plainly insufficient to create a genuine dispute of material fact. *See Goenaga* v. *March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir. 1995) ("[T]he plaintiff cannot meet this burden through reliance on unsupported assertions. Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party … must come forward with evidence that would be sufficient to support a jury verdict in his favor."). More fundamentally, the record makes clear that the Saint Francis Defendants fail to qualify as state actors under any of the three tests set forth by the Supreme Court.

### ii.     Plaintiff Cannot Satisfy the Compulsion Test

Under the compulsion test, private behavior becomes state action if "it results from the State's exercise of 'coercive power,'" or "the State provides 'significant encouragement, either overt or covert.'" *Brentwood Acad.,* 531 U.S. at 296 (quoting *Blum* v. *Yaretski,* 457 U.S. 991, 1004 (1982)); *see also Doe* v. *Harrison,* 254 F. Supp. 2d 338, 342 (S.D.N.Y. 2003). MHL § 9.37 does not require a physician responding to an application thereunder to hospitalize the patient subject to the referral; rather, it provides that "an examining physician … *may* receive and care for" such individual. MHL § 9.37 (emphasis

added); *cf. Rosenberg*, 996 F. Supp. at 349-50 (finding no State compulsion under § 9.27 because the provision stated that hospital director "may" hospitalize patient under certain conditions). Drs. Singh and Susco thus certified Plaintiff's need for further hospitalization independent of any state power, and although MHL § 9.37 required them to evaluate Plaintiff after Dr. Barden's application, it did not preordain the outcome of their evaluations. *See Blum*, 457 U.S. at 1006-07 ("We cannot say that the State, by requiring completion of a form, is responsible for the physician's decision.").

Dr. Sidhu, who conducted a preliminary evaluation of Plaintiff to determine whether his underlying behavior was psychiatric or medical — an assessment independent of MHL § 9.37's requirements — was even further removed from the power of the State. Indeed, he was operating wholly at the directive of Saint Francis's policies rather than those of the State. *See Sybalski* v. *Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257-58 (2d Cir. 2008) (state action requires more than "state involvement in '*some activity* of the institution alleged to have inflicted injury upon a plaintiff,'" and instead requires "that the state was involved 'with the *activity that caused the injury*' giving rise to the action." (emphases in original) (quoting *Schlein* v. *Milford Hosp., Inc.,* 561 F.2d 427, 428 (2d Cir. 1977) (per curiam)). The State therefore did not compel any of the Saint Francis Defendants' decisions.

### iii. Plaintiff Cannot Satisfy the Close-Nexus or Joint-Action Test

Plaintiff's state-action arguments focus on the close-nexus or joint-action test. A plaintiff satisfies this test by establishing "a sufficiently close nexus

33

between the State and the challenged action of the [private] regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Rosenberg*, 996 F. Supp. at 349 (alteration in original) (quoting *Blum*, 457 U.S. at 1004). To meet this standard, the State must "so far insinuate[] itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise." *Turturro* v. *Cont'l Airlines*, 334 F. Supp. 2d 383, 396 (S.D.N.Y 2004) (quoting *Rosenberg*, 334 F. Supp. at 352). The Supreme Court views this test as assurance that courts will hold private parties to constitutional standards only if "the State is *responsible* for the specific conduct of which the plaintiff complains." *Blum*, 457 U.S. at 1004.

In *Blum* v. *Yaretsky*, the Supreme Court held that private physicians and nursing home administrators who transferred or discharged elderly Medicaid recipients to lower levels of care were *not* state actors, despite the fact that the State responded to such decisions by adjusting the recipients' benefits. 457 U.S. at 1005. The Court reasoned that although regulations required the physicians to complete certain forms to obtain benefits and required the nursing homes to place patients at an appropriate level of care, "[t]hese regulations [did] not require the nursing homes to rely on the forms in making discharge or transfer decisions, nor [did] they demonstrate that the State [was] responsible for the decision to transfer particular patients." *Id.* at 1006-08. Indeed, "[t]hose decisions ultimately turn[ed] on medical judgments made by private parties according to professional standards that are not established by the State." *Id.* at 1008.

Plaintiff argues that under MHL § 9.37, the physicians at Saint Francis could not have hospitalized him absent the certification of Dr. Barden — clearly a state actor — and thus the private physicians' subsequent determinations became those of the State. (*See* Pl. Opp. 21-22). In Plaintiff's view, any private physician confirming a hospitalization under MHL § 9.37 becomes a state actor by virtue of the requisite initial application by the director of community services. This argument paints with too broad a brush, and, indeed, runs afoul of the fact-intensive analysis required in determining when private conduct crosses over into state action. *See Burton* v. *Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961) ("Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance."); *Int'l Soc. For Krishna Consciousness, Inc.* v. *Air Can.*, 727 F.2d 253, 255 (2d Cir. 1984). Moreover, although MHL § 9.37 by its terms involves state actors, the ultimate determination of whether to hospitalize a patient falls on the medical judgments of private physicians applying standards that the State has no part in instituting. *See Turturro*, 334 F. Supp. 2d at 395-96.

Plaintiff next seeks refuge in several recent district court cases that have found state action on the part of private physicians who acted merely as "rubber stamps" to state actors' hospitalization determinations pursuant to MHL § 9.37. (*See* Pl. Opp. 22-23). To discuss these cases, however, is to distinguish them from the instant case. In *Tewksbury* v. *Dowling*, 169 F. Supp. 2d 103 (E.D.N.Y. 2001), for instance, the district court, ruling on the

35

defendant physicians' summary judgment motion, held that private physicians employed by a private hospital "jointly participated with state officials" by hospitalizing the plaintiff under MHL § 9.37 based solely on a phone call communicating the state officials' determination that the plaintiff required hospitalization. *Id.* at 110. Other private physicians also certified the plaintiff for further hospitalization in reliance on information obtained from state officials. *Id.* The court cautioned, however, that "if the decision to commit [the plaintiff] was based purely on their own independent medical judgment," the physicians would not have been state actors. *Id.* at 109.

The court in *Bryant* v. *Steele*, 93 F. Supp. 3d 80 (E.D.N.Y. 2015), reached a similar conclusion. There, the district court upheld the sufficiency of a complaint alleging that after a state actor submitted an MHL § 9.37 application to a private hospital, the hospital confirmed the plaintiff's need for hospitalization "without conducting an independent medical examination." *Id.* at 90. The court also relied on *Tewksbury* to point out that the private physicians could not have hospitalized the plaintiff under MHL § 9.37 without an initial application from a state actor. *See id.* at 92 (quoting *Tewksbury*, 169 F. Supp. 2d at 110).

Plaintiff here has failed to establish that Dr. Barden was "so far insinuated" with the Saint Francis Defendants that their determinations were interdependent. *Turturro*, 334 F. Supp. 2d at 396. To begin, Dr. Sidhu testified that although he was aware of Dr. Barden's determination, his decision to restrain and medicate Plaintiff was "based only on [Plaintiff's] condition and

conduct" at Saint Francis. (Sidhu Decl. ¶¶ 16-17). And medical records that he and a treating nurse completed on October 22 corroborate Dr. Sidhu's characterization of Plaintiff's condition. (*See* Fischer Decl., Ex. N, at 18-19, 34, 46). But more importantly, as discussed above, Dr. Sidhu played no role in the hospitalization procedure that MHL § 9.37 establishes.

The record belies Plaintiff's bald assertion that he never received a face-to-face evaluation from Dr. Singh and fails to create a triable issue of material fact as to Dr. Singh's independent medical evaluation. Aside from Dr. Singh's testimony that he evaluated Plaintiff for approximately 45 minutes, his evaluation notes contain statements such as "patient denies," "patient states," and "[patient] reports," indicating a live interaction with Plaintiff, and it also includes information not otherwise available in Plaintiff's medical records. (*See* Fischer Decl., Ex. N, at 11; *see, e.g., id.* ("[Plaintiff] reports that right now he is also attending college on-line.")). Moreover, his notes indicate a time of dictation at 4:19 p.m. (*see id.* at 12; Singh Reply Decl., ¶ 11), and a nurse's note states that Dr. Singh evaluated Plaintiff at approximately 3:30 p.m. on October 22 (*see* Fischer Decl., Ex. N, at 17; Slocum Decl.), which coincides with Dr. Singh's estimated 45-minute evaluation.

As to Dr. Susco, Plaintiff does not deny meeting with him on October 24, 2009, and receiving a psychiatric evaluation at the time, but instead complains about the subject matter of that meeting. (*See* Pl. Aff. ¶ 48). Although Dr. Susco performed this evaluation two days after Plaintiff's initial admission to Saint Francis, this is exactly the procedure that MHL § 9.37 contemplates. *See*

MHL § 9.37(a). Furthermore, Plaintiff does not deny and presents no evidence contradicting Dr. Susco's observations of and interactions with Plaintiff during the two preceding days.

Thus, while treating and evaluating Plaintiff, the Saint Francis Defendants primarily utilized independent medical judgment, thereby separating themselves from the preceding state action on the part of Dr. Barden. *See Blum*, 457 U.S. at 1006-08; *cf. Bryant*, 93 F. Supp. 3d at 90-91 (holding plaintiff sufficiently pled state action by alleging that private physicians admitted plaintiff "upon the assessment of ... a state actor[] without conducting an independent medical examination"); *Tewksbury*, 169 F. Supp. 2d at 109 (finding state action where plaintiff was admitted to private hospital after government referral "without any independent examination"). To be sure, the Saint Francis Defendants readily admit their cognizance of the events leading up to Plaintiff's hospitalization as well as Dr. Barden's evaluation. But "mere '[c]ommunications,' even regular ones, 'between a private and a state actor, without facts supporting a concerted effort or plan between the parties, are insufficient to make the private party a state actor." *Bryant*, 93 F. Supp. 3d at 91 (quoting *Fisk* v. *Letterman*, 401 F. Supp. 2d 362, 377 (S.D.N.Y. 2005)).

Lastly, Plaintiff argues that Saint Francis acted on the State's behalf because "the [S]tate has outsourced its commitment authority to [Saint] Francis as it was the only provider of inpatient psychiatric services in Dutchess County." (Pl. Opp. 24). In raising this argument, Plaintiff relies on *Rhee* v. *Good Samaritan Hospital*, where the district court refused to dismiss a § 1983

claim based on the plaintiff's hospitalization, reasoning in part that under *West v. Atkins*, 487 U.S. 42 (1988), the plaintiff's allegation that a state-affiliated hospital "'outsourced' its commitment decisions to [a private hospital]," could suffice for state action depending on the contractual relationship between the State and the hospital. *See* No. 12 Civ. 8508 (NSR), 2015 WL 1501460, at *6-7 (S.D.N.Y. Mar. 30, 2015).[14]

Plaintiff can point to no similar contractual relationship between the State and Saint Francis or any of its physicians. Undeterred, Plaintiff argues the State has delegated its commitment authority to Saint Francis by virtue of the hospital's position as the only provider of inpatient psychiatric services in Dutchess County. Even so, Plaintiff has brought forth no facts that so much as hint that the State had anything to do with this position. *Cf. West*, 487 U.S. at 55 ("Under state law, the only medical care [plaintiff] could receive ... was that provided by the State."); *Rhee*, 2015 WL 1501460, at *6-7. Plaintiff thus fails to raise a genuine dispute of fact that the State was in any way responsible for the decisions of Plaintiff's treating physicians. *See Schlein*, 561 F.2d at 429 ("Even assuming ... that the Hospital occupies a monopoly position

---

[14]    In *West* v. *Atkins*, the Supreme Court held that a physician who, under contract with the State, provided medical services to inmates at a state prison hospital on a part-time basis was a state actor. *See* 487 U.S. 42, 54-55 (1988). The Court reasoned that the State "employ[ed] physicians ... and defer[red] to their professional judgment, in order to fulfill" its constitutional obligation under the Eighth Amendment to provide prisoners medical care, and "[b]y virtue of this relationship, effected by state law, [the physician was] authorized and obliged to treat prison inmates," such as the plaintiff, and did so "clothed with the authority of state law." *Id.* at 55 (quoting *United States* v. *Classic*, 313 U.S. 299, 326 (1941)).

in the [relevant geographical] area … such status is not determinative of state action." (citing *Jackson*, 419 U.S at 351-52)).

### iv. Plaintiff Cannot Satisfy the Public-Function Test

Although Plaintiff does not expressly invoke the public-function test, the Court nevertheless addresses it for completeness.  Under this test, a private party becomes a state actor "where the State delegates its responsibilities to [the] private part[y] and then attempts to escape liability for constitutional violations caused by private parties acting pursuant to the delegation." *Rosenberg*, 996 F. Supp. at 353 (citing *Rockwell* v. *Cape Cod Hosp.*, 26 F.3d 254, 258 (1st Cir. 1994)).  The analysis thus turns on whether the private party's alleged constitutional violation occurred while exercising authority that is "traditionally the exclusive prerogative of the State."  *Rendell-Baker* v. *Kohn*, 457 U.S. 830, 842 (1982) (emphasis removed) (quoting *Jackson*, 419 U.S. at 353).  The Second Circuit has recognized that private hospitals, though "clearly 'affected with a public interest,' … have not been 'traditionally associated with sovereignty,' and have long been relegated to the private domain, rather than treated as 'traditionally the exclusive prerogative of the State.'"  *Schlein*, 561 F.2d at 429 (quoting *Jackson*, 419 U.S. at 353)).  Thus, in the absence of any evidence to the contrary, the Court shall assume the same in the more specific context of involuntary hospitalizations.  *See Turturro*, 334 F. Supp. 2d at 396-97.

In sum, Plaintiff has failed to establish that Dr. Singh, Dr. Sidhu, Dr. Susco, or Saint Francis acted at the behest of the State in a sense that would

render them subject to constitutional scrutiny. The Court therefore dismisses with prejudice Plaintiff's Second, Third, Fourth, and Seventh Causes of Action.

### d.    Dr. Barden Is Entitled to Qualified Immunity

Dr. Barden does not dispute that he is a state actor, but argues instead that he did not violate any of Plaintiff's constitutional rights and, alternatively, that he is subject to qualified immunity. (Barden Br. 11-23). While Dr. Barden's arguments opposing Plaintiff's claims of Fourth and Fourteenth Amendment violations have considerable traction, his qualified immunity arguments are plainly correct and require summary judgment in his favor.

### i.    The Defense of Qualified Immunity

"The defense of qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kerman* v. *City of N.Y.*, 374 F.3d 93, 108 (2d Cir. 2004) (quoting *Harlow* v. *Fitzgerald,* 457 U.S. 800, 818 (1982)); *accord Ashcroft* v. *al-Kidd*, 563 U.S. 731, 735 (2011). Thus, "[w]hether qualified immunity can be invoked turns on the 'objective legal reasonableness' of the official's acts." *Ziglar* v. *Abbasi*, 137 S. Ct. 1843, 1866 (2017) (quoting *Harlow*, 457 U.S. at 819). "And reasonableness of official action, in turn, must be 'assessed in light of the legal rules that were clearly established at the time [the action] was taken.'" *Id.* (alteration in original) (quoting *Anderson* v. *Creighton*, 483 U.S. 635, 639 (1987)). At base, "qualified

immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley* v. *Briggs*, 475 U.S. 335, 341 (1986)).

As noted, defendants are entitled to qualified immunity "if they can establish either that [i] 'a constitutional right was [not] violated' or [ii] 'the right was [not] clearly established.'" *Royal Crown Day Care LLC* v. *Dep't of Health and Mental Hygiene of City of N.Y.*, 746 F.3d 538, 543 (2d Cir. 2014) (second and fourth alterations in original) (quoting *Bailey* v. *Pataki*, 708 F.3d 391, 404 (2d Cir. 2013)). Courts undertaking this analysis "have discretion to decide the order in which to engage these two prongs," but they "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan* v. *Cotton*, 134 S. Ct. 1861, 1866 (2014) (citations omitted).

### ii. The Right Plaintiff Asserts Was Not Clearly Established

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Reichle* v. *Howards*, 566 U.S. 658, 132 S. Ct. 2088, 2093 (2012)). Because the rights allegedly violated may appear abstract, "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established." *Ziglar*, 137 S. Ct. at 1866 (emphasis and alteration in original) (internal quotation marks omitted) (quoting *Mullenix*, 136 S. Ct. at 308). "It is not necessary, of course, that 'the very action in question has previously been held unlawful.'" *Id.* (quoting *Anderson*, 483 U.S. at 640). "But 'in the light of pre-existing law,' the unlawfulness of the officer's conduct 'must be apparent.'" *Id.* at 1867 (quoting *Anderson*, 483 U.S. at 640).

Put somewhat differently, a constitutional right is clearly established if (i) it is "defined with reasonable clarity," (ii) "the Supreme Court or the Second Circuit has confirmed the existence of the right," and (iii) "a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Bailey*, 709 F.3d at 404-05 (citing *Luna* v. *Pico*, 356 F.3d 481, 490 (2d Cir. 2004)). A court's definition of the purported right "must be 'particularized' in the sense that '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right.'" *Golodner* v. *Berliner*, 770 F.3d 196, 206 (2d Cir. 2014) (first alteration in original) (quoting *Anderson*, 483 U.S. at 640). A court must walk a middle course in defining the right at issue: Outline rights too broadly and plaintiffs would be able to subvert qualified immunity merely by alleging violations of exaggeratedly abstract rights; construe rights too narrowly and government actors would never encounter the same right twice, thus enjoying almost boundless immunity. *See LaBounty* v. *Coughlin*, 137 F.3d 68, 73-74 (2d Cir. 1998) (quoting *Anderson,* 483 U.S. at 639)).

The Supreme Court and the Second Circuit have clearly established that the State may not involuntarily hospitalize an individual consistent with the Fourth or Fourteenth Amendment absent a showing that the individual poses a danger to himself or others. *See O'Connor* v. *Donaldson*, 422 U.S. 563, 576 (1975) (applying Fourteenth Amendment to involuntary commitment); *Glass* v. *Mayas*, 984 F.2d 55, 57-58 (2d Cir. 1993) ("Because we have already concluded that the defendants were objectively reasonable in finding [plaintiff] dangerous

in the due process context, it follows that they were objectively reasonable in making the same determination in the Fourth Amendment context.").  In both of these contexts, however, Plaintiff argues he was entitled to a more robust right to be free from involuntary hospitalization "in the absence of recent homicidal or other violent behavior." (Pl. Opp. 17 (discussing Fourth Amendment); *see id.* at 19 (arguing Dr. Barden violated Fourteenth Amendment in failing to find "*present* homicidal or other violent behavior" before applying for hospitalization (emphasis added))).  This is not the law.

As an initial matter, Plaintiff derives this purported right from a faulty reading of the Mental Hygiene Law.  To be sure, MHL § 9.37 requires that a patient subject to hospitalization have a mental illness that "is likely to result in serious harm to himself or others," and MHL § 9.01 defines "likely to result in serious harm" to include "a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm."  But Plaintiff ascribes undue significance to the verb "are" in arguing that Dr. Barden could only consider recent events — none of which, Plaintiff contends, evidenced homicidal or violent behavior.  (*See* Pl. Opp. 13-15).  Nothing in law or logic requires medical professionals to put out of their minds all knowledge of a patient's past behavior, no matter how serious, in determining that patient's present danger to himself or others.  Rather, medical professionals must be permitted to consider that behavior when evaluating more recent conduct, in

order to contextualize the latter and, in so doing, arrive at a more accurate assessment of the patient's dangerousness *vel non*.[15]

The Court has found no authority supporting Plaintiff's foreshortened construction of the statute. To the contrary, the Second Circuit has held that New York's civil commitment scheme does not offend due process even if it requires a showing of dangerousness that does not include an "overt act" evincing a present risk of physical harm. *See Project Release* v. *Prevost*, 722 F.2d 960, 973-74 (1983) ("[T]he New York State civil commitment scheme, considered as a whole and as interpreted ... to include a showing of dangerousness, meets minimum due process standards without the addition of an overt act requirement."). Plaintiff's failure to point to any precedent suggesting the existence of the right he now claims is both unsurprising and fatal to his argument. *See Bailey*, 709 F.3d at 404-05 (citing *Luna*, 356 F.3d at 490).

Plaintiff did not enjoy as expansive a right as he contends; at the very least, the right Plaintiff now claims was not clearly established at the time of his October 2009 commitment. Nevertheless, Plaintiff *did* enjoy a clearly-established right not to be hospitalized absent a showing of dangerousness. The Court shall therefore consider whether Dr. Barden

---

[15]     The Court recognizes that a patient's past behavior may be so different in kind, or so distant in time, that a medical professional would obtain no insight from it in determining the patient's present danger to himself or others. However, this case is far different, where the record overwhelmingly demonstrates that Plaintiff was given to [redacted], and that a number of medical professionals with longstanding, firsthand knowledge of Plaintiff's behavior were aware that he was not in full compliance with his medication protocols and was exhibiting obvious signs of [redacted].

reasonably believed that Plaintiff was dangerous when he interacted with Plaintiff based on the information he possessed at that time. *See Glass*, 984 F.2d at 57.[16]

### iii. Dr. Barden Acted Reasonably

A government official's decisions "must be viewed as objectively reasonable unless 'no [official] of reasonable competence could have made the same choice in similar circumstances.'" *Green*, 465 F.3d at 92 (quoting *Lennon* v. *Miller*, 66 F.3d 612, 420-21 (2d Cir. 1995)). Where the facts that are relevant to qualified immunity are not in dispute, the issue of whether a government official acted reasonably is ripe for summary judgment. *See Tierney* v. *Davidson*, 133 F.3d 189, 194-95 (2d Cir. 1998) (quoting *Hunter* v. *Bryant*, 502 U.S. 224, 227 (1991); *Lennon*, 66 F.3d at 422; *Warren* v. *Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990)).

In *Glass* v. *Maya*, the Second Circuit considered whether a physician was immune from Fourth and Fourteenth Amendment claims arising from the physician's forcible hospitalization of the plaintiff. *See* 984 F.3d at 57-58. The court ruled that the physician acted reasonably and was thus entitled to

---

[16]     Plaintiff also asserts that the Court need not assess whether his purported constitutional right was clearly established because "an exception to this rule exists when governmental officials violate state statutory or administrative law that create[s] the federal cause of action," and because "[MHL §] 9.37 gives rise to a cause of action, Dr. Barden forfeits his immunity by violating the statute." (Pl. Opp. 21). Even accepting Plaintiff's statement of law as true, however, the Court need not belabor why Plaintiff's argument fails: MHL § 9.37 does not contain an express private right of action, and Plaintiff has not argued, much less shown, that the Court should imply a private right of action. *See also Torres* v. *Faxton St. Lukes Healthcare*, 227 F. Supp. 3d 216, 240 (N.D.N.Y. 2017) ("[A] finding that MHL Article 9 implies a private right of action giving rise to liability appears to be wholly inconsistent with the intent of the legislative scheme." (citing *Mclean* v. *City of N.Y.*, 905 N.E.2d 194, 242 (N.Y. 2009))).

qualified immunity because the physician received reports that the plaintiff threatened another individual with a gun; exhibited "strange behavior"; was described by those who examined him as "hostile, guarded, angry, suspicious, uncooperative, and paranoid"; and "had an extensive psychiatric history, which included a history of violent behavior," multiple psychiatric hospitalizations, "and a family history of mental illness." *Id.* at 57. Additionally, the plaintiff was "hostile and uncooperative" during every examination he received throughout the admission process. *Id.*

Here, the undisputed facts establish that Dr. Barden acted reasonably in applying for Plaintiff's hospitalization. Before meeting with Plaintiff, Dr. Barden received reports from Stern and ACT team members regarding Plaintiff's hostile and threatening behavior. (*See* Barden Dep. 26:19-27:14). Further, he received word that Plaintiff was not cooperating with treatment and that Plaintiff typically became [redacted]. (*Id.* at 32:16-20). Dr. Barden also reviewed Plaintiff's psychiatric history, which contains numerous accounts of [redacted], regardless of Plaintiff's controversion of certain peripheral facts during this litigation. (*Id.* at 44:9-47:20). In addition, Dr. Barden was aware of Plaintiff's criminal history, including charges of burglary and criminal mischief. (*Id.*). Regardless of current disputes regarding the veracity of this information, it was before Dr. Barden without such disputes at the time of his assessment, and he reasonably relied on it in making his determination. *See Castro* v. *United States*, 34 F.3d 106, 112 (2d Cir. 1994) ("Officials are 'entitled to

qualified immunity [when] their decision was *reasonable*, even if mistaken." (alteration in original) (quoting *Hunter*, 502 U.S. at 229)).

Plaintiff argues that Dr. Barden failed to conduct a formal psychiatric evaluation of Plaintiff, thus rendering his hospitalization objectively unreasonable. (*See* Pl. Opp. 18). But this argument overlooks Dr. Barden's thwarted attempt to evaluate Plaintiff in a more formal setting than that of their interaction after Plaintiff's unexpected arrival at Dr. Barden's office. This interaction occurred immediately after Dr. Barden received (i) a referral from John Stern and (ii) a plethora of information regarding Plaintiff's psychiatric condition, rendering it a perfect opportunity for Dr. Barden to evaluate Plaintiff. And even taking Plaintiff's account of their interaction as true, viewed against the informational backdrop before which Dr. Barden was then operating, Plaintiff's abrupt arrival and departure would have itself been bizarre and alarming, and Dr. Barden thus did not act unreasonably in fearing for the safety of Plaintiff, himself, and others.

The constitutional claims against Dr. Barden fail as a matter of law because it is not at all clear that he violated Plaintiff's rights under the Fourth and Fourteenth Amendments and, at the very least, he is entitled to qualified immunity. The Court thus dismisses with prejudice Plaintiff's First and Fifth Causes of Action.

### 2. The Court Declines to Exercise Supplemental Jurisdiction Over Plaintiff's Remaining Claims

Having dismissed Plaintiff's federal constitutional claims, his only remaining claims, contained in the Eighth and Ninth Counts of the First

Amended Complaint, allege medical malpractice under state law against Drs. Barden, Susco, and Singh, and Saint Francis. The Court declines to exercise supplemental jurisdiction over these claims.

A district court has discretion to "decline to exercise supplemental jurisdiction" after "dismiss[ing] all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c); *see Klein & Co. Futures, Inc.* v. *Bd. of Trade of City of N.Y.*, 464 F.3d 255, 263 (2d Cir. 2006) ("[T]he decision to retain jurisdiction is discretionary and not a litigant's right[.]"). In making this determination, courts "balance[] the traditional 'values of judicial economy, convenience, fairness, and comity.'" *Kolari* v. *N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ.* v. *Cohill*, 484 U.S. 343, 350 (1988)). In general, "if the federal claims are dismissed before trial, … the state claims should be dismissed as well." *United Mine Workers of Am.* v. *Gibbs*, 383 U.S. 715, 726 (1966). Moreover, "[a]lthough the exercise of supplemental jurisdiction is discretionary, the ordinary case 'will point toward declining jurisdiction over the remaining state-law claims.'" *Jordan* v. *Chase Manhattan Bank*, 91 F. Supp. 3d 491, 511 (S.D.N.Y. 2015) (quoting *In re Merrill Lynch Ltd. Partnerships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998)).

Here, all factors weigh in favor of declining supplemental jurisdiction over Plaintiff's state-law claims. First, considering judicial economy, although this case has been ongoing since 2012, Plaintiff's remaining claims involve four defendants and complex factual issues that may not prove amenable to resolution by way of summary judgment. *Cf. Chenensky* v. *N.Y. Life Ins. Co.*,

942 F. Supp. 2d 388, 393 (S.D.N.Y. 2013) (declining to exercise supplemental jurisdiction over state-law claims in five-year-old case). Second, refiling in state court will present only a minor inconvenience to the parties, especially considering the discovery they have already completed. Third, proceeding to state court will place none of the parties at any disadvantage relative to their current positions in this litigation. Fourth and finally, given that only state-law issues remain in this case, comity dictates that the Court decline to decide those disputes. *Cf. Bray* v. *City of N.Y.*, 356 F. Supp. 2d 277, 287 (S.D.N.Y. 2004) (declining to exercise supplemental jurisdiction over state claims despite federal defenses).

Therefore, the Court dismisses Plaintiff's Eighth and Ninth Causes of Action without prejudice to their refiling in state court.

### CONCLUSION

For the reasons set forth above, Defendants' motions for summary judgment are GRANTED. Plaintiff's First, Second, Third, Fourth, Fifth, Sixth, and Seventh Causes of Action are DISMISSED WITH PREJUDICE. Plaintiff's Eighth and Ninth Causes of Action are DISMISSED WITHOUT PREJUDICE.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:     January 8, 2018
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge